The founders intended the militia to be a check against federal overreach. This case presents the question to what extent the federal government can undermine that check. Defendants hear that they have power to punish non-federalized militia for failure to follow federal rules. Nothing in the Constitution gives them that power. I like to spend most of my time discussing three buckets of authorities, each showing that the Constitution prevents the federal government from punishing non-federalized militia. That's the Constitution's text, original intent, and historical practice. I think with that bigger constitutional issue settled, the rest of this case is rather easy. I'd like to spend the remainder of my time then addressing why each of defendants' specific punishments here are all indeed unconstitutional. Of course, I'm happy to address their arbitrary and capricious arguments. Starting with the broader constitutional issue, Article I's second militia clause, the organizing clause, gives Congress three powers over non-federalized militia. Those are the powers to provide for arming, organizing, and disciplining these militia. None of those powers confers authority to punish non-federalized militia. The arming and organizing powers clearly do not confer that authority, and defendants do not say otherwise. Defendants say that the disciplining power gives them authority to punish. But, as our reply brief explained in some detail, discipline, especially in this context and especially at the founding, referred to instructions, not punishment. So, in your view, the federal government can provide rules of discipline for non-federalized troops that cannot prescribe punishment? That's right, Your Honor. Can you draw that distinction how? We draw that distinction based on the fact that the organizing clause only gives Congress a governing power when it federalizes the militia. Until it federalizes the militia, it does not have the power to govern the militia. It only has power to prescribe rules or provide for arming, organizing, and disciplining the militia. They've hinged their argument on the disciplining power, I think, but in context, it's clear the disciplining power does not give power to punish. And the organizing clause makes that especially clear because it gives the states authority to train their militia according to Congress's discipline. Now, that only makes sense if discipline refers to something like instructions, as we have said, because no one trains another according to a punishment. So what is the gist of the difference between discipline and punishment? Well, discipline in this context at the founding era, when you're talking about military regulation, is rules for — it's a set of instructions for the militia to learn for preparation for combat, essentially. I think it's a stretch to say that vaccination could be one of those rules, but we don't challenge whether that's a proper rule of discipline here. We're only challenging whether the federal government has power to enforce that rule before they federalized the militia. As for the governing power, defendants here notably have offered no interpretation for what the governing power consists of. So why is it punishment? I thought it was conceded or not at issue that no, quote, discipline in terms of imprisonment or any other kind of onerous consequence that I might think about as punishment or discipline are at issue here. It's about the dollars and cents. So seemingly it's acknowledged that when federalized under the appropriate provisions, the government can put conditions on funding. And so it seems there's no dispute about conditioning the funding. So this is about money. So why is the reservation of funds, you know, to an individual guardsman or the unit, why is that punishment when cededly, I think I read, the government is not saying a consequence of not being vaccinated is to be imprisoned, court-martialed, or anything that I might commonsensically think about discipline. So your term of art is punishment. So just kind of help me understand the dollars and cents aspect of the punishment. Certainly, Your Honor. Well, we recognize that they could impose, we recognize these are not the most onerous forms of punishment. They're not threatening to imprison anybody. That's right. Of course, under their argument, there's no reason why they couldn't escalate the punishments to include imprisonment. They don't seem to recognize that there's any limit on their authority to enforce their rules. But setting that aside, I also don't think that this is just about dollars and cents. There appear to be four forms of punishment that they're willing to impose on non-federalized militia who fail to be vaccinated. One is a court-martial. They've hedged to what extent they can actually do that, whether the punishment that comes out of a court-martial would have to comply with state rules. It's not clear what their position is here. Under their theory, that would be unconstitutional, too, right? It would absolutely be unconstitutional. A court-martial, a non-federalized National Guard member would be unconstitutional in your view. It would absolutely be unconstitutional for them to convene a court-martial for non-federalized militia. That's right. And there are three other punishments that they appear to have threatened. One is discharge. So that's not just dollars and cents. They're threatening to kick our militia members out of our militia, essentially. Another punishment that they've threatened is to say that non-unvaccinated militia members cannot train in Title 32 training, which is state-run training, with their colleagues. The final punishment, as Your Honor recognizes, is withholding of pay. And I think that withholding of pay is probably the trickiest of their punishments to characterize here. But you can avoid the constitutional issue entirely by just interpreting 32 U.S.C. 108 according to its plain text. That's the authority that they rely on to withhold pay. And 32 U.S.C. Section 108 says that they can withhold pay from a National Guard of a state. It does not say that they can withhold pay from individual members. If you interpret that according to its plain text, we recognize that it's constitutional. It says you can withhold the money from the unit itself, in whole or in part. So the money can be withheld from the unit as a whole, and the language says in whole or in part. Why does it necessarily follow that you can withhold the money from the unit itself? And with the language in whole and part, an individual is a part of the unit. So why does it follow that that's the dividing line? I take your question, Your Honor. 32 U.S.C. Section 108 is not a model of clarity. But we would argue that you should interpret it in a way that does not raise a constitutional problem by applying it to individual guardsmen. And I think that the text is consistent with that. In fact, I think the most compelling reading of the text is to say that in whole or in part modifies the word barred. So a state can be barred in whole or a state can be barred in part from receiving funding from the Federal Government. So in whole or in part really is just referring to a quantum of money that the Federal Government gives to the states. And there are multiple streams of money that flow from the Federal Government when it comes to regulating the National Guard. They issue paychecks to individual guardsmen. But they also give the states money for various purposes. And we reckon unit as a whole did not fulfill conditions required to be, you know, at the National Guard as such. And the government says, fine, you know, if you don't want to do it, you don't have to. But we don't fund it. That's punishment of the unit? I mean, Texas is still free to, you know, have its own guard, et cetera, et cetera. It's just you don't get the money. I take your point, Your Honor. I think I've got two responses. The first is that in this situation where the state is not honoring the Federal Government's rules of discipline, the Federal Government has a remedy. It has multiple remedies, in fact. But at least one of those remedies is to say, well, we're going to withhold funding that we give to you, the state. And then the state can determine where the chips will fall. The state can determine for itself whether it's going to coerce its members to be vaccinated, or the state can just eat the cost of the dollars it loses from the Federal Government. But the second point here is that although we do characterize everything that the defendants have done as a punishment, the real relevant term here is governing. The organizing clause doesn't refer to punishment. It doesn't refer to, quote, unquote, consequences like my friends on the other side have said. It refers to a power of governing. And whether we're talking about punishment, consequences, anything that the Federal Government is doing to coerce the militia, to bend to the Federal Government's will, is prohibited unless they're exercising the governing power. And they can't exercise that power here because they have not federalized. How does DOD normally carry out immunization requirements for non-federalized Guard members? And what's different about the COVID vaccine? Yeah, that's a great question, Your Honor. I think, you know, for the lion's share of the vaccination requirements, it's just, you know, it's one and done. You get it before you enter the National Guard. The states have not objected to that requirement. And so I don't think that this dispute arises in those circumstances. The flu vaccine perhaps is an exception where you're getting immunized every year. But our understanding is that, and our experience, is that the Federal Government does not go out of its way to enforce the flu vaccination requirement. In fact, it's common for National Guard units to never achieve 100 percent immunization for flu. So this is a unique circumstance. This is really unprecedented. I think this goes a little bit to our arbitrary and capricious argument where, you know, come back to another term. I know you like punishment, but let's come back to readiness. You know, the government has, the military has a responsibility to determine readiness, et cetera. I mean, a long time ago, you know, I was a soldier, Veterans Day will be Friday, and I got a whole bunch of inoculations that I sure would have preferred not to have had, but, you know, they say in order to be, you know, fit and readiness for what's needed, roll up your arm. Which one do you want, the left arm or the right arm? Neither is what I said, but I'm not being facetious or light with you. I'm trying to just troll the notion of, quote, readiness and fitness, and in the scheme of, you know, the military, you know, they're just these things to be done, and so you get 25 different inoculations. That's not lost on me that the whole COVID piece from a philosophical standpoint is a different deal, but just the readiness didn't seem that in what I read there's a contest that DLD has the power, authority, et cetera, to determine, quote, readiness of the unit itself and to attach certain prescriptions on that. So if that's a given, I'm just still back to why is that true as to a whole unit? If you don't choose to do it, then X, but you draw this line that that can't pertain to an individual who must also be ready in terms of performance. Do you understand what I'm saying? I think I do, Your Honor. I think I've got two responses here. This really goes to the question of what are their remedies if the state does not want to be ready to their expectations, and I have two responses here. The first is that Your Honor mentioned the Army, but this is ‑‑ I know it's different, and perhaps I shouldn't have thrown that out there. I know, you know, that's, you know, active duty, but I was only trying to get into this notion of this multiple of inoculations as part of the readiness component. It's really my only ‑‑ Certainly, Your Honor. So this is a ‑‑ the defendants have characterized this as a readiness requirement. The lion's share of readiness requirements the state of Texas complies with. Admittedly, we don't want to comply with this one, or we don't want to force our militia members to comply with this one, but the states can go quite a bit further insofar as not complying with readiness requirements. In fact, the states can say we're not going to train our militia altogether, and I don't think there's anything exceptional about that. Let me quote Justice Johnson at page 37 of Houston v. Moore. Justice Johnson said that if the states will not officer or train their men, there is no power given to Congress to supply the deficiency. That's essentially what we're talking about here. They're saying that the vaccination requirement is a training requirement essentially, perhaps an attenuated training requirement, but they have no power to supply the deficiency if the states will not enforce that requirement for them. And I don't think that there's anything exceptional about that. The defendants have multiple other ways. They have multiple remedies and multiple other ways to defend the nation. They can, for one, as Perpich recognizes, they have broad power to federalize the National Guard. We don't contest that. They haven't done that here. They don't want to take the political hit that's associated with federalizing the National Guard and imposing a vaccine requirement then. They also always have the power to draft individuals if they feel that the volunteer force they have is insufficient. There's no hint of that here. And we recognize that defendants have remedies, such as under 32 U.S.C. Section 108, if the states will not do what the federal government says. And we would just ask Your Honors to limit them to the remedy that's there. They can withhold funding from the state itself. They can't punish individual guardsmen. Mr. Bosch, can I ask you a question about the spending argument, in particular the two answers you gave to Judge Willett a little earlier. If the Department of Defense said the state of Texas' unfederalized militia has a 70 percent vaccination compliance rate and so 30 percent of the unfederalized guard is unvaccinated, so we're going to dock the state 30 percent of its federal funds, is that a permissible use of 108, or is that an impermissible governing of the unfederalized militia? We recognize that they can withhold funding from the state. And so if they're unsatisfied with how the state is complying with their rules of discipline, they can withhold money in part, as Your Honor suggests, from the state. We recognize that Section 108 gives them authority to withhold money in full. They might choose the in-part route as a less coercive measure, but we do recognize they can withhold funds from the state itself. And is the withholding of funds the one and only method by which the federal government can constitutionally enforce a vaccine mandate on non-federalized guard members? I'm sorry. Did Your Honor ask if it's only a constitutional mechanism? It's certainly the only statutory mechanism that we would recognize as constitutional here. You can imagine many other hypotheticals, I think. I mean, this also gets away a little bit from the fact that it would be very easy for the defendants to get their way here. The defendants, all that they have to do is federalize the militia and then say, well, now that you're federalized, we have the governing power, it's time to get vaccinated. The Perpich case recognized that they have very broad authority to federalize. So I think that they could withhold funds. They could take another route by federalizing. There's a range of options that may be constitutional that simply aren't presented here. But it's not hard for the defendants to get their way. They don't want to take the political hit that's associated with getting their way. What is the limit on federalizing? So Article I, Section 8, Clause 15 recognizes three specific circumstances where federalization is appropriate. The Perpich case also recognized that the federal government has broad authority to federalize the National Guards because they sign up to be reservists. And Perpich left it a little unclear whether the federal government has infinite power to federalize the reservists, National Guardsmen who are reservists, or whether there are some limits. I would direct Your Honor to footnote 24 of the Perpich case, which seems to leave open that there might be limits if the federal government were federalizing for the Perpich. If the National Guards' federalization impaired the state's ability to respond to emergencies or to train its militia, I recognize that I'm out of time. That was the conclusion of my question. No, you're good. I mean, complete your response. I would just direct Your Honor to footnote 24 of the Perpich case for whether there are any limits on the federalization power. I recognize that I'm out of time. So you would say, okay, if you want to vaccinate, federalize them. And so I could easily see in some other circumstance the argument being that's overreach, you know, as opposed to respecting the dignity of the state's National Guard and the independence of the National Guard and the individual member, who in many cases has a civilian job and family and, you know, all the things that go with that in addition to his or her service to the state, et cetera. So by not being federalized, it would seem the government is recognizing the dignity and integrity of the separate scheme that the state has as opposed to federalizing you. So now you can't do your daily job. You've got to sit over here and do this and pulling people away from their families and all of that. But you would say it's an all-or-nothing proposition. We do, Your Honor. We don't see this as them respecting the state's dignity. We see them as asking Governor Abbott to be their hatchet man, essentially, and to take a political hit that they're not willing to take themselves. They have broad power to federalize. If they really think the vaccination requirement is important, then they can exercise that power within limits. All right. Thank you, Your Honor. Any questions? I certainly have reserved your rebuttal rights. Thank you. Thank you, sir. Ms. Clark. May it please the Court, Sarah Clark for the United States. Members of the National Guard are members of the federal military reserves, and as such, they must be ready for federal active duty at all times. The Plaintiff's Challenge ignores the detailed century-old statutory scheme that Congress has established to govern the National Guard, and it also ignores that the military has long required the National Guard to meet these kinds of readiness requirements. Plaintiff's Challenge would require the federal government to keep paying National Guardsmen even while they refuse to comply with readiness requirements. The Constitution doesn't require that result. So I'll start with the core of Plaintiff's Challenge, which is this supposed prohibition on punishment in the Second Militia Clause. So that theory has no basis in the text of the Constitution, right? The Second Militia Clause doesn't speak at all about punishment, and Plaintiff's attempts to graft that requirement into the clause. But my ears, at least, slow down a little bit. Yes. Yes, Your Honor. I mean, I hear you, but you're talking a little bit fast, so let me just slow down a little. No problem. So Plaintiff has two main textual arguments as to why punishment is off-limits to the federal government when the National Guard is not federalized. So their first, and I take their main, argument to be the idea that certainly the federal government can punish the National Guard when they're federalized under the governing power, and from that they extrapolate that it can't have that power under organizing, arming, or disciplining. But I don't think that makes sense, right? Because the federal government, when it's governing the militia, when it's in federal service, certainly still has the power to arm and to discipline the National Guards. The idea that these two buckets have to be mutually exclusive I don't think follows, and I don't think it would make any sense if that were the system that was envisioned. I'm not sure I followed that at all, because the way I read it is that the federal government always has the power to organize, arm, and discipline the militia. That's just a general grant in Article I, Section 8, so that is clear. And then they have this more limited power to govern only in federalized service, but so that you can't do the converse, right? The first is a general power that they've always got, and the second is a limited power for federal service. We agree. So we're not suggesting that the federal government can govern the National Guard when it's not in federal service, but what I'm pointing out is that Plaintiff bases their punishment theory on the idea that governing has no overlap with any of the other powers, whereas I think governing is broader than, but overlaps with the kinds of powers envisioned under, for example, disciplining or arming. I didn't understand. So my principal question for you is, what do you think the difference is between disciplining and governing? And it would be quite a hash of this text to say that governing is broader, right? Because governing has to be narrower, doesn't it? Because the governing is limited to a specific circumstance, namely when the President of the United States calls the Guard into national service. I understand what you're saying. So the governing power is narrower in the sense that it only applies in a specific set of circumstances, but it's broader in that when the federal government is governing the National Guard, it has more powers over the National Guard than it would otherwise, because before the National Guard is federalized, the state and the federal government have concurrent power over the National Guard. They're both involved in running it, for lack of a better word. But when the National Guard has been federalized and when it's being governed by the federal government, then they're in the exclusive control of the federal government. So it's a question of shared power versus exclusive power. So in that sense, the governing power is broader. Can I try to get at it this way? You would agree, I assume it was Mr. Bosch, that the federal government and the President of the United States has zero power to govern the unfederalized Guard, right? I agree. I think I disagree with plaintiff about what the ramifications of that sentence are. Right, but you would agree that whatever the content is of governing, there's no governing power when the Guard is not federalized? Yes, again, with the caveat that there may be things that fall under both the governing power and the disciplining power, and those powers are not taken away from the federal government over the non-federalized militia, just because they're powers that the federal government has when it's governing the federalized militia. Then how are we supposed to give content to governing versus disciplining if you agree with your friend on the other side that they are distinct? Well, again, governing is, I guess, broader to use my term. It tells the states, the National Guard, that they're exclusively within federal control. So it's not superfluous, as I think plaintiff has suggested, because it expands or delineates a broader bucket of powers. I think plaintiff also suggests that, well, that would make it superfluous with the Commander-in-Chief Clause, and that's not right because the Second Militia Clause deals with Congress's power over the militia, and the Commander-in-Chief Clause deals with the president's power. So I just wanted to note that that sort of superfluous argument doesn't work. While we're on the topic of the Commander-in-Chief Clause, is the United States government's view that the Texas Constitution's provision that makes the governor of the state of Texas the commander-in-chief of the unfederalized militia unconstitutional? Or preempted by federal statute, otherwise unlawful? We haven't taken that position here. I think what has been understood up until sort of this readiness requirement, including in Texas law, is that the federal government sets requirements and qualifications for the National Guard whether or not they're in actual federal service. So it's setting requirements for the non-federalized National Guard, and Texas law, as we pointed out, expressly recognizes that in their statutes and says to be eligible for appointment, for example, you need to be qualified under U.S. law and regulations. So what would be an example of something that Governor Abbott could lawfully do as the commander-in-chief of the unfederalized Guard pursuant to that constitutional power? He could order them to state active duty, for example, as he's done with Operation Lone Star, I think plaintiffs have pointed out. So he can tell his non-federalized National Guardsmen, go do this duty, do this training. When that's happening, he's responsible for paying them. The middle bucket, which is, I think, the one that is most at issue here, is when National Guardsmen are serving under Title 32. That's when they're doing federal training that's paid for by the federal government that's purpose is to ready National Guardsmen for federal service. So it's that training that unvaccinated National Guardsmen cannot participate in because they're not ready. As a result, they can't get paid for it. And sort of the down-the-line outcome would be their federal recognition would be withdrawn and they would be discharged. So that's the sort of chain of consequences. That's all within the universe of the federal Title 32 training. So I think plaintiff tries to sort of blur the lines a little bit by referring to this as the militia and sort of suggesting that we're controlling their militiamen. But it's important to keep in mind that the National Guard is a subset of the militia. It's the organized militia that's funded by the federal government that's preparing for federal service. And so a lot of plaintiff's arguments just fall apart once you understand that this requirement is not for sort of militia writ large or the militia even as the sort of founding generation would have thought of it because at the time there was no hybrid institution. But there was also no standing army. So I'm not sure. I'm having a hard time understanding this argument. So I want to make sure I get what you're saying. So the way I understand the United States' position is that we just ignore the founding era history that says the people of the United States at the time of the ratification of Article I, Section 8 were deeply concerned with the federal government controlling unfederalized militia because there was no National Guard at the time. But you also say that Article I, Section 8, Clauses 15 and 16 apply to the National Guard. So I'm a little bit confused as to exactly how you're getting at that. So it's not that the history needs to be ignored or is irrelevant. So I think what we can say looking back at the debates, for example, is that some men at the founding were concerned that the militia would be subject to martial law in peacetime, and then, of course, they were concerned that that would be used as a tool to sort of lead to consent to a standing army. But the concerns that they raised really just don't translate to individuals who have voluntarily joined the federal military reserves as the National Guard has. So it's not that we need to ignore the history, but there's a limit to how much it can tell us given the policy choice that Congress made a century ago to create a dual enlistment National Guard system whereby a subset of the militia will also join the federal military and be subject to qualifications, requirements, training, so that they can more easily integrate into federal active duty when needed. But you still agree that whatever limits, I realize you have sharp disagreements about what those limits are, but the agreements of Article I, Section 8, Clauses 15 and 16 apply to the National Guard. Yes. Notwithstanding the fact that there was no National Guard at the time of the founding. Right, because the National Guard is a subset of the militia, and the Second Militia Clause is concerned with the militia. So Congress has explained that we have the organized militia, which is the National Guard, and then we have the unorganized militia, of which, for example, the State Defense Force, the Texas State Guard, is a subset. So I think that, too, just underscores that the state's militia power is not being improperly infringed by the federal government setting requirements for federal reserve members. They can continue to have their state defense force as they do. They can build it up further. So the idea that the sort of militia as a whole is being attacked or even affected by this requirement is just not the case. So can I—I don't mean to put words in your mouth, so tell me that I'm being unfair in this question. But if I'm understanding this last argument, it is that the United States government agrees that it could not court-martial a member of the State Guard, but it can court-martial part of the unfederalized National Guard. If I'm understanding you correctly, yes, I think I agree. So the non-federalized National Guard, those are the people that it has authority to court-martial under 32 U.S.C. 326 and 327, not the Texas State Guard, the State Defense Force. And it also can't call up the State Defense Force into the armed forces. It's full-stop. Congress has prescribed that those people are off-limits. Let me make sure I understand. So it's the view of the United States that if a non-federalized Guard member refuses to be vaccinated, he or she could be court-martialed. So this is an important distinction. So 32 U.S.C. 326 and 327 authorize court-martial for non-federalized National Guardsmen. Here, in the context of the COVID vaccine, that consequence is just not on the table for a number of reasons. I mean, one, the federal government has never suggested that it had any intention of doing that. It never has court-martialed any service member, including an active duty for declining the COVID vaccine. And those statutes also say that any punishment that arises out of such a court-martial will be prescribed by state law. So in this context, I think that only underscores that there is no chance that a Texas National Guardsman will be punished via court-martial while they're in non-federal prison. You say no chance, but not because, in your view, you lack the authority. Right. It's not a question of lack of statutory authority. It's just a question of, you know... And the same, for that matter, beyond court-martialing, the same for imprisonment, that if a non-federalized guard member refuses to be vaccinated, it's the view of the United States, whether it's on the table or not, it's the view, as a legal interpretation matter, that person could be imprisoned. So, again, flagging that here I don't think there's any possibility Texas state law would prescribe that as a punishment for refusing the vaccine and setting aside the fact that the federal government has no interest and never has court-martialed anyone for refusing the vaccine, then, yeah, you know, I think there is sort of, like, down the chain of possibilities of potential for imprisonment. But if that, you know... If that nub were sort of a problem, it wouldn't warrant the kind of relief that plaintiff is seeking here because most of the consequences that they focus on are just the administrative results of failing to meet a readiness requirement. So it could be the COVID vaccine. It could be you haven't had your dental exam. When you show up to federal training, you need to be ready and to satisfy the federal readiness requirements that the government has set, and there's nothing punitive about those consequences. So even if this court were to sort of agree with plaintiff that punishment is off-limits in some sense, those administrative results from declining the vaccine wouldn't fall under that. So is the only punishment that the United States seeks to impose monetary? I don't think that's exactly right because... So that certainly is the most immediate consequence, right? If you're not participating in training, you're not going to get paid for that training. But National Guardsmen do have to meet federal qualifications to maintain their federal recognition, and if you are not federally recognized, then you can't remain. You can't continue on in service in the National Guard and sort of be subject to being called up. Discharge? So it would result in discharge, yes. So if you don't meet qualifications, your federal recognition is withdrawn, and then you will be discharged. So 32 U.S.C. 322 through 324 sort of lay out that. Do you have an example, and I'll take anything from the debates or any founding era source, that suggests that the president of the United States can discharge a member of the unfederalized militia? So an example from the founding era? Anything from the 18th century. So I just don't think that concept translates because either the militia at the time either was in federal service, so it would be falling outside the bucket they were discussing, or they were essentially just the sort of citizens living their lives and doing occasional training. So there was nothing to be discharged from. And even today, of course, you can't be discharged from the militia writ large because the militia is just, you know, able-bodied men between 17 and 45 who are U.S. citizens, essentially. You can, however, be discharged from the federal military, and because every National Guardsman has enlisted in the federal military, you can certainly be discharged from that body. So the reason why I think there wouldn't be an example from the 18th century is because there was no sort of body of men that would be subject to that... There was no one to have that, you know, recognition taken away from. It's hard to understand how that's true, given that if there's no standing federal army, there are organized state militias throughout the 18th century, which is why there are so many people objecting throughout Eliot's debates over the idea that the president of the United States could court-martial those people. So I think the distinction is that there was no hybrid middle institution or activity that would be akin to Title 32 training. And that's where I come back to the thing I'm really hung up on, because you say, well, look, this hybrid thing didn't exist at the founding, yet we, the United States, agree that the limits on this hybrid thing didn't come from Article I, Section 8, Clauses 15 and 16. So I don't understand what the limits are. I would think that the corollary of there was no hybrid is the militia described by Article I, Section 8, Clauses 15 and 16 just doesn't apply. Now, that would make some sort of theoretical coherence to me. So I don't think that's right, Your Honor. So the Militia Clause continues to apply, but when we're talking about the specific subset of the militia, this kind of specially defined group of men, not every concern or sort of circumstances that might have applied to the militia writ large will necessarily apply to that group. So I'm not suggesting that the second Militia Clause doesn't apply to the National Guard, but some of the sort of concerns that plaintiff flags don't translate, and some of the scenarios, for lack of a better word, just wouldn't exist at the founding. That doesn't mean that sort of the clause has no relevance. It just has to be understood in context of the policy choice that Congress made a century ago that the Supreme Court blessed in perpetuating. It said Congress has used this power in different ways. Its current choice is just as acceptable as its 1792 choice. You know, both are options. Both are ways that Congress could exercise its power. There doesn't need to have been a sort of consistent form that a subset or all of the militia has taken. I just want to make sure... I think one other point I wanted to be sure to point out, plaintiff says the solution is easy, just federalize people who won't get vaccinated in the National Guard, and then you can make them get vaccinated, and then there's no problem. So I think in their brief it took the form a little more of a wait to see if you need them, and then if you need them, vaccinate them then, and that argument doesn't work for the reasons we explained in our brief. A slightly different flavor, I think, was surfaced today, which is just federalize them now, make them get vaccinated, and then problem solved. You don't need to wait. That's not a practical solution. For one, 10 U.S.C. 12301 governs the way that the reserve components can be activated or federalized, and it says that if you're going to be called up, you need to be called up by unit, essentially, unless there are certain special circumstances that have met. So that's just one example why sort of just call them up solution doesn't work here. I think that fits most into the arbitrary and capricious segment, but I just wanted to be clear that it's not a sort of easy on-off switch like that, and taking that approach would also be inconsistent with the general... I see my time has expired. May I briefly conclude this? You can finish your talk. Okay, great. So I just wanted to say that would be inconsistent with the way that the National Guard and the states have understood readiness requirements to operate. So not only would it be impractical, it would also be quite novel. If the Court has no further questions, then we ask this Court affirm. All right, thank you. Mr. Bosch, you've reserved your rebuttal. Thank you, Your Honor. Four brief points. Their position appears to be that we've organized the militia, and therefore we can govern the militia, but that's not what Article I, Section 8, Clause 16 says. It says they can govern the militia only when they federalize the militia, and here there seems to be no dispute that they have not done so. They say the National Guard is a hybrid organization, and therefore different rules apply than applied to the organizations that existed at the founding, but they recognize that the organizing clause still controls here, and so I don't see how the fact that they've organized the militia into various components gives them additional power they didn't have at the founding. Along those lines, I still think we've heard no answer to what the governing power actually consists of. If I understood my friend on the other side today, it sounds like what she was saying is that when the Guard is not federalized, the states and the federal government have overlapping powers, but when the Guard is federalized, the federal government's power is exclusive. But the organizing clause uses the term governing as distinct from arming, organizing, and disciplining, so you would think that it means something different, and new powers arise when the federal government federalizes the militia. I don't think my friend on the other side identified a single new power that arises under the governing power. My third point is that there appear to be no limits to my friend on the other side's position. My friend on the other side said that they have the constitutional authority to court-martial non-federalized militia for failing to follow federal rules. So it's not hard to see how a different administration might impose a truly onerous requirement backed up by truly onerous punishment. It's not clear what constitutional limits, according to their argument, there are in such a circumstance. You could imagine, for example, that a different administration might say that a rule of discipline is that the unfederalized militia have to practice dueling with live ammo. I mean, that's hypothetical, and that's theoretical. Is that what it's about, the real facts that are on the ground, or what might be hypothesized in some other unknown circumstance? I mean, I get your point, but, I mean, we can take it out into infinity. I think that's the problem with their argument is that there doesn't appear to be any stopping point from taking it out to infinity. They said that they can court-martial non-federalized militia members. I don't see why they can't imprison them under their argument. So our position has a clear stopping point. They can punish them when they federalize them, but they can't do so before. If you take my friend's point from the other side about their power to punish non-federalized militia, they can destroy the militia as an institution altogether, violating the promises that the Founders made to George Mason and the Anti-Federalists about the militia. My final point is that, I think I heard my friend on the other side refer to Title 32 training as being federal. It is, it's correct to say that it's, that Title 32 training is paid for, or individual guardsmen are paid by federal dollars when they participate in Title 32 training. But Title 32 training is conducted by the states. That's a direct quote from ROA 419, Defendant's Declarant. Title 32 training is conducted by the states. It's consistent with the organizing clauses express textual commitment of the training of non-federalized militia to the states. So I don't think that the mere happenstance that they're being paid by federal dollars gives the federal government a power to punish them. Again, the organizing clause gives them power to arm non-federalized militia, and you can think of Title 32 training as a form of essentially arming them, preparing them, teaching them the rules of discipline, but that does not give them a power to then govern them before they're federalized. If your honors have no further questions, I'll relinquish the remainder of my time. All right, thank you, Mr. Bonner. Appreciate your briefing and argument. Thank you, counsel on the other side. Case will be submitted.